[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON REQUEST BY PLAINTIFF FOR INJUNCTIVE RELIEF
In this action for an injunction the plaintiff is the State Traffic Commission (STC) and the defendants are Joseph Pacetti and Taco Bell Corporation. Mr. Pacetti is the owner of a development called the Vernon Park Plaza in Vernon and Taco Bell operates a restaurant in the development. The Shawmut Bank was a former defendant but has ceased to operate its facility in the development. The bank, however, still retains its leasehold interest which includes an access drive to the development.
Originally Mr. Pacetti planned to construct a 120,000 square foot retail shopping center providing 427 parking spaces. The proposed development would have included a large supermarket and was expected to generate up to 1289 car trips either entering or leaving the plaza during each of the peak hours of operation.
Section 14-311(a) of the general statutes provides in relevant part that "no (person) may build, expand, establish or operate any (development) generating large volumes of traffic . . . until such (person) has procured from the (STC) a certificate that the operation (of the development) will not imperil the safety of the public." Conn. Agencies Regs. § 14-312-16(a) in turn provides that a development "providing two hundred or more parking spaces, or a gross floor area of 100,000 square feet or more" generates large volumes of traffic.
Since the proposed development would have generated large volumes of traffic, according to these definitions, on July 23, 1989 Mr. Pacetti applied to the STC for a certificate of operation. The STC referred the application to the Bureau of Engineering and Highway Operation of the State Department of Transportation (BEHO) which conducted CT Page 340 a traffic study of the proposed development to determine its impact on the flow of traffic. Mr. Chapman, an engineer for the BEHO, prepared a report which recommended the proposed development be permitted to operate if eleven conditions concerning roadway improvements were met. The police chief of the town of Vernon concurred with the Chapman recommendation and this was noted on the report. The report was based on the design, size, and expected traffic generation of the development as proposed.
On September 19, 1989 certificate #973 was issued to Mr. Pacetti and on September 25, 1989 he was so notified by the executive director of the STC. The certificate marked Exhibit A, provided among other things that no person shall operate the development or any portion thereof prior to the completion of all the conditions unless permission has been requested and received from the State Traffic Commission.
At some point in the fall of 1990 Taco Bell began constructing its restaurant and on November 14, 1990 Mr. Chapman informed the executive director of the STC that Taco Bell should not be issued a certificate of occupancy unless all the eleven conditions in the original certificate were completed or the STC granted a revised partial opening. At this point the actions of James Bubaris, P.E., must be examined. The original application for a certificate of operation submitted by Mr. Pacetti referred to Bubaris as an "Authorized representative to be contacted during review of application."
On November 21, 1990 Mr. Bubaris wrote the STC requesting that Taco Bell be allowed to open without complying with the conditions set forth in the original certificate of operation. Mr. Bubaris had conducted a study and concluded that the existing geometry and phasing of the intersection was sufficient for the operation of the Taco Bell, the Shawmut Bank and a proposed Department of Motor Vehicles facility located across the street from the development.
In the Bubaris letter Exhibit 13, a commitment was made to do certain road work in front of the Taco Bell in the spring of 1991 if the STC would permit the Taco Bell to open in December. CT Page 341
Mr. Chapman of the BEHO testified that he relied on the representations made in the Bubaris letter in preparing another report which recommended to the STC that Taco Bell be permitted to operate pursuant to an amended certificate and without full compliance with the requirements of the original certificate if two conditions were met. The conditions were that a traffic sign be installed and that no more than a total of 12,200 square feet of building space would be occupied until all the conditions of the original certificate had been met. The Vernon police chief again concurred with the BEHO recommendation.
On December 18, 1990 the STC adopted the Chapman recommendation and approved an amended certificate which permitted the opening of the Taco Bell. Mr. Pacetti was notified on the same day. Mr. Pacetti complied with the conditions set forth in the amended certificate and has continued to do so but the roadwork referred to in the Bubaris letter was never done. The development continues to consist solely of Taco Bell and a vacant Shawmut Bank because the Town of Vernon Inland/Wetland Commission refused to issue the permits necessary for an expansion of the development. Apart from the two mentioned uses no other uses are made of the rest of the property.
On December 18, 1992 the director of the STC wrote Mr. Pacetti to inform him that the STC had voted to order him to cease and desist operating those portions of the development currently doing business in violation of the original certificate. The STC did not send a copy of the order to Taco Bell headquarters in California but the STC executive director testified he did send a copy to a Mr. James Santos. Mr. Santos denies receiving a copy of the order and Taco Bell does not have a copy of the order in its files at corporate headquarters in California. Mr. Santos was the construction manager for the Taco Bell Restaurant in December 1990 but had no responsibility for operating it in 1992, Santos is an employee of Taco Bell who was responsible for obtaining the necessary permits for the restaurant certificate of occupancy. Mr. Santos testified that he was aware of the fact that the certificate of occupancy was in jeopardy in November 1990 and received a copy of the Bubaris letter to the STC. Mr. Santos reported none of this to his superiors because CT Page 342 he said he was assured by Mr. Pacetti that the work necessary to comply with the original certificate would be done But subsequent to the issuance of the certificate Mr. Santos became aware of the fact that this work which was supposed to be done in the spring of 1991 had not been done.
Before proceeding to a general discussion of the issues involved in this case the court should discuss an issue that arose during the hearing on this matter involving the Bubaris letter to Mr. Chapman concerning the opening of the Taco Bell restaurant.
The STC argued that Mr. Pacetti was bound by Mr. Bubaris' representations because he was Pacetti's agent. The burden of proving an agency relationship is on the person asserting an agency relationship existed, L.C. BatesCo. v. Austin Nichols Co., 143 Conn. 392, 394 (1956). But even if the agency-principal relationship is established a party offering the agent's statements or representations to bind the principal must establish that the agent was authorized by the principal to make admissions for the principal. Wade v. Yale University,129 Conn. 615, 618 (1943). It is also true that an agent's authority cannot be proved by out-of-court declarations of the agent though the agent can testify to any facts relevant to show that authority, E. Paul Kovacs Co. v.Blumgarten, 150 Conn. 8, 13 (1962).
There is a doctrine of complied authority which can define the agent's authority solely on the basis of the nature of the task which the principal assigns to the agent and is not dependent on the perceptions of a third party dealing with the agent, cf Wesson v. F.M. Heritage Co.,174 Conn. 236, 242 (1978), Tierney v. American Urban Co.,170 Conn. 243, 250 (1976), Collens v. New Canaan Water Co.,155 Conn. 477, 496 (1967), Lickteig v. Buckholz, 129 Conn. 399,402 (1942). But it would be difficult to find implied authority for Bubaris to make representations in this letter binding Pacetti by the mere fact that some months before Pacetti, in the original application, represented that Bubaris was his authorized representative. The letter in issue was written over a year after the original certificate was granted. CT Page 343
Why Mr. Pacetti wasn't asked the necessary questions to establish the agency relationship and the agent's authority escapes the court, but it was brought out at the hearing that not only did Mr. Pacetti list Bubaris as his authorized representative to be contacted during review of the original application but also with knowledge of its contents and at his direction Mr. Pacetti instructed Bubaris to send this letter to the STC covering an area, traffic control, which was involved also in the original application. Under these circumstances the doctrine of apparent authority would seem to apply so as to allow the attribution of the representations in the Bubaris letter to Mr. Pacetti. Apparent authority is an issue of fact to be determined on the basis of two criteria:
 . . . "First, it must appear from the principal's conduct that the principal held the agent out as possessing sufficient authority to embrace the act in question, or knowingly permitted (the agent) to act as having such authority. . . Second, the party dealing with the agent must have, `acting in good faith, reasonably believed under all the circumstances, that the agent had the necessary authority' to bind the principal to the agent's action."
Tomlinson v. Board of Education, 226 Conn. 704, 735-736 (1993).
Also of some relevance is the doctrine of agency by estoppel which is a near relative of apparent authority, see Lapuk v. Blount, 2 Conn. Cir. 271, 277 (1963), 3 Am.Jur.2d § 19, pages 523-524. At least as to Mr. Chapman and his
recommendation as to an amended certificate an estoppel notion could be advanced in the sense that he had every right to rely on the Bubaris letter and Pacetti, having authorized the sending of it, cannot now deny the authority of Bubaris to make the representations to Mr. Chapman that he did. Pacetti should not under these circumstances be permitted to prevent the introduction of the Bubaris letter into evidence, although the importance and relevance of that letter as to subsequent STC action and the issues before the court are separate questions.
The preceding provides a general evidentiary discussion of some of the matters brought out at the hearing in this matter. At the hearing the STC sought an CT Page 344 injunction enjoining the defendants from operating the development and granting the STC permission to maintain a barrier to prevent traffic from entering the premises.
1.
At common law an injunction could be secured only if a party showed irreparable harm and the unavailability of an adequate remedy at law, Bigelow v. Hartford BridgeCompany, 14 Conn. 565, 580 (1841), Whittlesey v. TheHartford, Providence Fishkill RR Co., 23 Conn. 421,433 (1855). Sections 52-471 and 52-473 C.G.S.A. are the statutory vehicles for enforcing the common law remedy.
Cases from other states and in our state have held that where a statute authorizes a public entity such as a zoning board or a state regulatory agency to seek an injunction to enforce compliance with a regulatory scheme but says nothing about the injury caused, the public entity is not required to show irreparable harm or the unavailability of an adequate remedy at law prior to obtaining the injunction. All that must be shown is a violation of the particular statute or ordinance, Crabtreev. Van Hise, 39 Conn. Sup. 334, 337 (1983), Johnson v.Murzyn, 1 Conn. App. 176, 180 (1984).
Several provisions throughout our statutes authorize various agencies or commissions to seek injunction relief for violation of some order or regulation that an agency has issued pursuant to a particular statutory scheme; examples are Section 8-12 of the zoning law, Section14-311 (b) of the Traffic Control and Highway Safety Act, Section 19-159a having to do with the powers of the Commission on Hospitals and Health Care, Section 22a-376 of the Water Resources Act, Section 22a-435 of the Water Pollution Control Act.
(a)
The court will deal with two preliminary matters before turning directly to the merits of the case.
The defendants note that the complaint seems to seek relief both by means of a common law injunction and by reliance on Section 14-311(b). CT Page 345
The complaint makes allegations as to various matters concerning traffic safety and the dangers presented to public safety by the failure of Mr. Pacetti to make certain road improvements. These assertions might be necessary allegations if a common law injunction were being sought but are not required for a Section 14-311(b) injunction since irreparable harm need not be proved. (See pages 6-7 and page 11 of plaintiff's 2/16/93 memorandum for indication that it thought it had this burden under Section14-311(b); also plaintiff attempted to introduce such evidence at trial).
The point that the defendants seek to make is that largely as a result of the court's rulings the plaintiff STC presented no evidence at trial to support the allegations in the complaint that the development was a danger to the motoring public or that the intersection where there was access to the development was unsafe or that the operation of the Taco Bell had an adverse impact on the safety of the intersection.
Therefore, since the plaintiff alleged irreparable harm although it didn't have to, it waived its right to secure an injunction under Section 14-311(b) without proof of such harm. As the defendants point out, it has been said that the allegations of a complaint frame the issues to be decided at trial. Lundberg v. Kovacs, 177 Conn. 229,232 (1977). Grecki v. New Britain, 174 Conn. 200, 201
(1978). Therefore an unnecessary but voluntary allegation of a fact places the fact in issue and places the burden on the party alleging it even though without having alleged it the party would not have that burden. In dicta our court found no hesitation in applying the rule against the state in a condemnation case, State v. Fahey, 147 Conn. 13, 17
(1959).
If the defendants are correct in their reference to this rule, this decision could end here — there was no evidence of harm let alone irreparable harm. But I am reluctant to apply this draconian relic of common law pigeonhole pleading in an equitable proceeding. TheLundberg case was concerned with surprise or unfairness to the other party but here there can be no claim that these able lawyers for the defendants were confused or caught by CT Page 346 surprise by what might be characterized as the confusing mixture of legal claims and factual allegations in the pleadings. Also as it will be indicated later in this opinion, I agree with the defendants on an important point. The mere fact that a state agency doesn't have to show irreparable harm does not mean a court should automatically grant an injunction for violation of an order issued by an agency pursuant to some statutory or regulatory scheme. The court must still weigh the respective equities of the situation and position and interests of the opposing parties. Therefore it should have come as no surprise to the defendants that somewhere in this proceeding they might have had to confront or counter evidence by the plaintiff as to dangerous traffic conditions even if in seeking a § 14-311(b) injunction the plaintiff STC did not have to assume the burden of showing irreparable harm in the first instance.
In light of all this I am reluctant to apply this pleading rule in an equitable proceeding where a state agency purports to act to protect public safety pursuant to a state regulatory scheme set up to achieve that end. Also I believe it will be in the interests of both sides and perhaps long-run judicial economy if I address this case on the merits.
(b)
The defendant Pacetti makes another novel argument which if accepted would also preclude the STC from seeking injunctive relief pursuant to Section 14-311. That statute in subsection (a) reads as follows:
 (a) No person . . . shall build, expand, establish or operate any . . . shopping center or other development generating large volumes of traffic having an exit or entrance on, or abutting or adjoining, any state highway or substantially affecting state highway traffic within this state unless such person . . . has procured from the state traffic commission a certificate that the operation thereof will not imperil the CT Page 347 safety of the public.
As the defendant's argument goes, since Mr. Pacetti is no longer constructing, expanding or attempting to establish a development at the site, the STC in effect seeks to enjoin Mr. Pacetti's "operation" of this development. But, it is maintained, no evidence was introduced that Pacetti was in fact "operating" the development so the STC has failed to prove the statute (§ 14-311) applies.
Apparently neither the statute nor the regulations define what "operate" means. I suppose the court is now forced to consider the important purposes of the statute and rely on common sense. Acceptance of the Pacetti argument, in the court's opinion, would emasculate the statute and its intended purposes.
Developments which would otherwise fall under the statutory and regulatory scheme of § 14-311 may contain a small number of establishments so that once the premises are leased there is no need to have the owner of a development or an independently hired firm act as general manager of the whole development. If that is the case once a development is actually built the STC couldn't act under § 14-311 and its accompanying regulations if you accept Mr. Pacetti's argument. No individual store or bank or restaurant that happens to lease a portion of the development property could be subject to the statute since the statute speaks in general terms of one who "operate(s) . . . a shopping center or other development" — they only "operate" their specific business entity not the whole development. In such a case against whom would cease and desist orders be issued to accomplish the purposes of the statute.
One who builds a development, owns it, and then after construction leases portions of it out can be said to be "operating" the development. Without the owner's initial purchase of the land, building of the development, and rental of the units the development couldn't operate and in fact wouldn't be operating. Webster's Third New International Dictionary defines "operate" as follows:
1. To perform a work or labor: exert CT Page 348 power or influence: produce an effect . . . 2. To produce or take an appropriate effect.
Mr. Pacetti seems to concede that while a development is being built, expanded or established, the owner can be subject to the statute. Does that mean the instant the development is completed the statute can be applied against the owner if the development isn't operational because it hasn't been leased out yet but once some businesses get leases and start to operate the statute can't apply against the owner, although it's the owner's leasing out of the premises that is instrumental in causing the actual operation of the premises? Is there a hiatus between the time a development is completed and a leased-out premises handles its first customer in which the statute applies to no one? The very fact that such questions must be posed, given Mr. Pacetti's argument that he does not now "operate" the development, leads the court to reject his interpretation of "operate" as used in § 14-311.
2.
Turning more directly to the merits of this case the question really involves a discussion and analysis of the nature of a statutory injunction such as that authorized in subsection (b) of Section 14-311. The court has read the cases submitted by the parties and has relied heavily on the discussion in Law of Remedies, Dobbs, 2d ed, Vol. 1, § 2.10 "Statutory Injunctions", pp. 243-249.
In its trial brief, the State argues that this action must be viewed differently from a common law action for an injunction. Section 14-311(b) provides that the commissioner of the STC may apply to the court for injunctive relief. The State relies on Johnson v. Murzyn, 1 Conn. App[.] 176 (1984) which sums up the argument:
 It is true that the issuance of an injunction is the exercise of an extraordinary power which rests in the sound discretion of the trial court and that ordinarily the party seeking injunctive relief has the burden of alleging and proving irreparable harm CT Page 349 and lack of an adequate legal remedy . . . An injunction sought pursuant to a statute by the public official charged with the responsibility of enforcing the law, however, is an exceptional case which stands on a different footing. Id. page 179.
Referring to the earlier case of Crabtree v. Van Hise,39 Conn. Sup. 334, 337-338 (1983) the court at page 180 in effect said that when a statutory injunction is sought the public official need not show irreparable harm or the unavailability of an adequate remedy at law — all that must be shown as a violation of the statute or ordinance.Johnson thus dispenses with the need to analyze the particular statute providing for an injunction in terms of legislative intent; if a legislative provision provides for a statutory injunction, there is no need to show irreparable harm. Several cases in other jurisdictions stand for the same proposition, see Law of Remedies, Vol. 1, § 2.10, n. 5 at page 244.
All of this has presented great difficulties at least to the court.
I think the analysis should begin by referring to the statute's language. Section 14-311(b) reads as follows:
 (b) No local building official shall issue a building or foundation permit to any person, firm, corporation, state agency or municipal agency to build, expand, establish or operate such a development until the person, firm, corporation or agency provides to such official a copy of the certificate issued under this section by the commission. If the commission determines that any person, firm, corporation, or state or municipal agency has (1) started building, expanding, establishing or operating such a development without first obtaining a certificate from the CT Page 350 commission or (2) has failed to comply with the conditions of such a certificate, it shall order the person, firm, corporation or agency to (A) cease constructing, expanding, establishing or operating the development or (B) comply with the conditions of the certificate within a reasonable period of time. If such person, firm, corporation or agency fails to (i) cease such work or (ii) comply with an order of the commission within such time as specified by the commission, the commission may make an application to the superior court for the judicial district of Hartford-New Britain or the judicial district where the development is located enjoining the construction, expansion, establishment or operation of such development.
One problem here is to determine what "certificate" is operative in terms of applying the statutory language which defines the STC's right to secure injunctive relief. In this case the original certificate was amended by a letter from the STC allowing the Taco Bell to operate and the development to run on a reduced scale without complying with the conditions of the original certificate.
If this original certificate as amended is still in effect there can be no right to injunctive relief since there is no claim that the defendant has violated the provisions of the certificate as amended.
That is, a cease and desist order can only issue if a person "(2) has failed to comply with the conditions of such a certificate", § 14-311(b) and injunctive relief under the statute can be sought if the person or party against whom the order was directed fails to comply with it.
The STC response would seem to be that the certificate as amended is null and void because the cease and desist order issued here in effect reinstated the conditions set CT Page 351 forth in the original September 1989 certificate (see paragraphs 6 and 15 of Application for Temporary Injunction). Furthermore, according to the plaintiff the defendants are precluded from raising question as to the cease and desist order since by failing to appeal the order or seek a declaratory ruling, they have failed to exhaust administrative remedies.
Also the STC argues that the defendant Pacetti cannot in fairness rely on the authorization of the partial opening of the development for Taco Bell. The claim is made that this authorization was induced by the Bubaris letter which represented that all the eleven conditions of the original certificate would be complied with. They have not been complied with and it is argued therefore that Mr. Pacetti should be estopped from relying on the December 18, 1990 letter, Exhibit C, which amended the original certificate by allowing a partial opening of the development without compliance with the conditions set forth in the original certificate.
But even if all the assumptions and claims of the plaintiff were to be accepted, however, that would not entitle the plaintiff automatically to an injunction. It would only establish a prima facie right to request injunctive relief and the court would have to deal with what might be called the harm issue. In ConservationCommission v. Price, 173 Conn. 414, 429 (1984) the court approved the reasoning in Crabtree which held irreparable harm need not be shown in a statutory injunction case but then went on to add an important qualification to the notion that in statutory injunction cases a government agency is entitled to an automatic injunction aided by trial courts serving as compliant members of the bureaucratic apparatus. The court at page 430 referred to federal authority and said:
 It is the court's duty to carry out the intention of the legislature as expressed in the statute it has enacted and to make the remedy it has provided an effective and efficient means of dealing with violations of the act and regulations properly promulgated under its authority. See CT Page 352 Walter Resources Commission v. Connecticut Sand Stone Corporation, supra, 34. We point out, however, that "[t]he grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a [trial judge] . . . is not mechanically obligated to grant an injunction for every violation of law. TVA v. Hill, 437 U.S. 153, 193, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), Hecht Co. v. Bowles, [321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754
(1944)]." Weinberger v. Romero-Barcelo, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). Put another way, we do not view the statutory grant of jurisdiction as destroying the discretion of a trial court in every case under this act. Given the purpose and language of the act and the factual basis for the violation, the injunctive relief was properly ordered.
The difficulty lies in ascertaining what this language actually means. The courts have made several general comments:
 It is correct, of course, that a federal judge sitting as a chancellor is not mechanically obligated to grant an injunction for every violation of law, This Court made plain in Hecht Co. v. Bowles, 321 U.S. 321, 329
(1944), that "[a] grant of jurisdiction to issue compliance orders hardly suggests an absolute duty to do so under any and all circumstances." As a general matter it may be said that "[s]ince all or almost all equitable remedies are discretionary, the balancing of equities and hardships is appropriate CT Page 353 in almost any case as a guide to the chancellor's discretion." D. Dobbs, Remedies 52 (1973). Thus, in Hecht Co. the Court refused to grant an injunction when it appeared from the District Court findings that "the issuance of an injunction would have `no effect by way of insuring better compliance in the future' and would [have been] `unjust' to [the] petitioner and not `in the public interest.'" 321 U.S. at 326. T.V.A. v. Hill, 437 U.S. 153, 193-194 (1978). "It is the court's duty to carry out the intention of the legislature as expressed in the statute it has enacted and to make the remedy it has provided an effective and efficient means of dealing with violations of the act and regulations properly promulgated under its authority." Conservation Commission v. Price, supra, 430. This does not mean that a court is "mechanically obligated to grant an injunction for every violation of law." Weinberger v. Romero-Barcelo, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982). A judge retains a reasonable discretion to decide whether injunctive relief is appropriate even though it is authorized by statute. Burns v. Barrett, 212 Conn. 176, 179 (1989).
 TVA v. Hill, supra, was the famous snail-darter case. A unique species was found near the site of a soon to be completed dam that was part of the TVA system. The Secretary of the Interior pursuant to the Endangered Species Act sought an injunction to enjoin completion and thus operation of the dam. After using the general language just quoted which recognized the discretionary power of trial courts even in statutory injunction cases, the court in fact went on to say that the case before it was not a case where a court should deny an injunction. The only statutory remedy was an injunction and as Dobbs CT Page 354 points out, Law of Remedies § 2.10, page 248, no one could be sued for damages for the destruction of the snail darters — it was an injunction or nothing at all. As Dobbs goes on to say, id. p. 248: "To deny all remedy is to deny the right itself. Judges can deny any enforcement of the plaintiff's right where the plaintiff has forfeited the right by his [sic] conduct, as in estoppel cases. Judges can also deny remedies on the basis of cost-benefit balances. But not so easy to think that the Congress means statutory rights to come and go in the discretion of a federal judge. Indeed the concept of a right is at odds with the concept of discretion to deny the right. So when the statute provided for an injunctive remedy and only an injunctive remedy, it provided strong reasons to think the court had no discretion to deny the only remedy there was."
But then came a case cited with approval in Burns v.Barrett, supra, Weinberger v. Romero-Barcelo,456 U.S. 305 (1981) where the court said:
 It was conceded in Hill that completion of the dam would eliminate an endangered species by destroying its critical habitat. Refusal to enjoin the action would have ignored "explicit provisions of the Endangered Species Act." 437 U.S. at 173. Congress, it appeared to us, had chosen the snail darter over the dam. The purpose and language of the statute limited the remedies available to the District Court, only an injunction could vindicate the objectives of the Act.
 That is not the case here. An injunction, is not the only means of ensuring compliance. The FWPCA itself, for example, provides for fines and criminal penalties. 33 U.S.S. §§ 1319(c) and (d). Respondents suggest that failure to enjoin the Navy will undermine the integrity of the permit process by allowing the statutory violation to continue. The CT Page 355 integrity of the Nation's waters, however, not the permit process, is the purpose of the FWPCA. As Congress explained, the objective of the FWPCA is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. 33 U.S.C. § 1251(a).
 This purpose to be achieved by compliance with the Act, including compliance with the permit requirements. Here, however, the discharge of ordinance had not polluted the waters, and although the District Court declined to enjoin the discharges, it neither ignored the statutory violation nor undercut the purpose and function of the permit system. The court ordered the Navy to apply for a permit. It temporarily, not permanently, allowed the Navy to continue its activities without a permit.
The later case of Amoco Production Co. v. Gambell,480 U.S. 531 (1987) following the logical implications ofRomero-Barcelo went further in the sense that it upheld the District Court's flat denial of a statutory injunction which didn't include continuing orders against the company involved. Among other things, the District Court had found the activities envisaged didn't cause the type of harm the federal act involved was designed to prevent. The Supreme Court in overruling the Court of Appeals' reversal of the District Court said the Court of Appeals . . ." had erroneously focused on the integrity of the permit process
rather than on the integrity of the Nation's waters," 480 U.S. at page 543.
In this case the statutes provide for a penalty provision (§ 14-213) in addition to injunctive relief. It is true that this alone would not preclude the granting of an injunction, however, Burns v. Barrett, supra at page 195. But more importantly in this case it is nowhere conceded nor can the court conclude on the basis of any CT Page 356 evidence presented that as was true in Johnson v. Murzyn, supra at p. 178, Crabtree v. Van Hise, supra at p. 334,Barrett, supra, or Burns v. Barrett, supra at p. 175, a threat to the interests the statutory scheme seeks to protect is in fact present and occurring — here, of course, the interest being that of traffic safety.
What the federal courts seem to be saying is that where the only proven allegation before a court is the failure to comply with statutory procedure or permit mandates of some type by a party subject to a regulatory scheme, there must be some showing of the actual occurrence of the activity which the statutory or regulatory scheme presupposes to be a danger, threat, or some otherwise legislatively defined infringement on the public interest. Once that is done then the agency may procure an injunction without going the extra step of showing irreparable harm. The Connecticut Court seems to accept this view; it citedRomero-Barcelo in Burns v. Barrett, supra, and used broad language not even found standing alone in the federal cases discussing statutory injunctions:
 "A judge retains a reasonable discretion to decide whether injunctive relief is appropriate even though it is authorized by statute,"
212 Conn. at p. 194.
Here I believe I should exercise that discretion against issuance of an injunction. As noted no evidence has been received regarding a threat to traffic safety, the defendant restaurant will be closed and its two dozen workers would be laid off. There was not even any evidence presented that compliance with the conditions of the original certificate would correct any traffic problems that might exist.[1]
Nor does the court's decision or this analysis place a draconian burden on state agencies seeking to secure injunctive relief pursuant to statutory provisions. The burden placed on the plaintiff here is no greater than the one the plaintiff itself ascertained that it had to assume (1) in its complaint by alleging a threat to traffic safety, (2) in its repeated efforts at trial to have evidence of traffic safety presented to the court, and (3) CT Page 357 by its post-trial motion to have the court reconsider an evidentiary ruling which prevented this evidence coming in at trial.
In fact the equitable balancing of interest referred to in these statutory injunction cases would in the court's opinion, place a relatively light burden on the state agency. It might be little more than a burden of presenting some evidence rather an obligation to prevail on the equities by a preponderance of evidence. It is not for the courts to second guess agencies on the danger to the public interest or welfare or second guess the legislature about the relative importance of such a danger vis-a-vis the burden of harm inflicted on a citizen once the legislature has provided for a statutory injunction. But the courts — at least unless explicitly so instructed by the legislature and leaving aside any due process concerns raised by that observation — cannot be required to issue injunctive relief against people without some showing of the existence of the danger or problem the statutory scheme sought to avert at least where the party opposing the injunction has shown such relief would harm its interests.
3.
As indicated, the court intends to deny the plaintiff's request for such relief.
However, several issues have been raised by the parties which should be discussed.
The plaintiff in its argument and briefs made reference to the exhaustion of administrative remedies doctrine and the Bubaris letter which represented that after the Taco Bell restaurant was opened the road improvements required in the original certificate would be completed by Mr. Pacetti. It was after this that the letter amending the original certificate and permitting the restaurant to open was sent to Pacetti. In the preceding discussion the court, in rejecting the plaintiff's claim for injunctive relief, accepted at least some of the assumptions made by and relied upon by the plaintiff in referring to the importance of these two matters.
However, the court only accepted these positions of CT Page 358 the plaintiff for purposes of discussion and to give what it thought was the best case scenario to the plaintiff's request for injunctive relief. The court, in fact, has real question as to the validity of the plaintiff's reliance on the exhaustion of administrative doctrine or any consequences that purportedly flowed from the Burbaris [Bubaris] letter. If the plaintiff's reliance on these arguments is not appropriate there, of course, would be added reason to deny injunctive relief and that court will discuss why it believes this to be so.
Also, the defendants in opposing the request for injunctive relief claimed that the plaintiff did not come into court with "clean hands" and that the plaintiff STC had no jurisdiction over the Pacetti development because it was not a "major traffic generator" as defined in § 14-311
C.G.S.A. The court, for reasons it will set forth, has not relied upon or accepted either of these two claims made by the defendants in denying injunctive relief.
The court will now discuss these remaining matters.
(a)
In a somewhat interesting use of traditional exhaustion of administrative remedies doctrine the plaintiff agency argued that the defendants should be precluded from contesting or bringing in issue the factual propriety of injunctive relief since they did not appeal the cease and desist order (§ 4-183) or secure a declaratory ruling (§ 4-176). An orderly process of administrative adjudication and judicial review exists and, by ignoring a valid order of the agency, the defendants can't "cast the plaintiff in the role of an ordinary litigant seeking an injunction." (Plaintiff's Trial Brief, page 8).
This is a novel application of the exhaustion doctrine since it is usually applied against plaintiffs seeking relief against or from state agencies. Here the doctrine is sought to be applied against the defendants who are resisting an application for injunctive relief by a state regulatory agency.
The exhaustion doctrine or more exactly some of the CT Page 359 principles behind it is applicable in a more indirect way in the situation where a government agency seeks a statutory injunction.
As TVA v. Hill implies at 437 U.S. page 172 and WaterResources Commission v. Conn. Sand Storage Corp. makes explicit at 170 Conn., page 33, it is fair to remove from the state agency the obligation to show irreparable harm and to bar a party opposing the chance to show in the first instance the injunction request is unreasonable only where at the agency level the defendant has had a chance to contest the basis of the agency action and appeal from any ruling made regarding the contested issue.
If a party had that opportunity and didn't take advantage of it, then it is appropriate to limit the burdens imposed on the state agency seeking a statutory injunction. This still would not mean the agency would be entitled to an automatic injunction since the considerations that will now be discussed are preliminary to the task the court would still have of "balancing the equities" before issuing an injunction provided for by State statute. Given these considerations then Commissionon Hospitals Health Care v. Stamford Hospital,208 Conn. 603 (1988) and the purpose for which the plaintiff cites it, is somewhat irrelevant.
The court has real concerns about the adequacy of the notice to Taco Bell. If that notice wasn't adequate, how can the plaintiff argue in these proceedings that by failing to appeal the cease and desist order or by neglecting to seek a declaratory ruling on it, Taco Bell has waived its right to resist any request for injunctive relief, let alone dispute the plaintiff's right to secure an injunction without showing irreparable harm?
Here the plaintiff did not notify anyone at Taco Bell's corporate office in California about its issuance of an order or intention to seek an injunction. It notified James Santos by regular mail about the order. Santos was only the construction manager for the restaurant, his responsibilities ended when the restaurant was built and then he moved to job tasks at other Taco Bell sites. Santos is not an officer of the corporation and did not operate the restaurant in 1992 when the order was issued. CT Page 360 At one point the Executive Director of the STC testified that he sent a copy of the order to Santos because his is "a name which appeared on previous correspondence in our files associated with Taco Bell enterprises." As the defendant points out when the plaintiff decided to sue the corporation it had no problem giving adequate statutory notice to the corporate headquarters in California. The plaintiff is right in saying "There is no rule of law that would require the plaintiff to notify Taco Bell in the same manner of service of process", reply memorandum page 4. But, on the other hand, it is the plaintiff who wishes to take advantage under Crabtree and Johnson v. Murzyn of the extraordinary power given to state agencies in seeking statutory injunctions. In that context it's somewhat disingenuous to claim that a lower level employee of a large corporation had the duty to give notice of state action to the corporation rather than the duty falling on the state agency itself.
Leaving aside the notice problem as to Taco Bell, the issue then becomes whether an to what extent the defendants can resist this request for injunctive relief in light of the fact that they didn't appeal the cease and desist order under § 4-183 or seek a declaratory ruling under § 4-176.
Did the defendants have an opportunity to appeal under § 4-183(c)? Section 14-183(a) provides that a person who has been aggrieved by a "final decision" may appeal. "Final decision" is defined in § 4-166(3) to mean among other things "(A) the agency determination in a contested case" and a "contested case" is defined in subsection (2) to mean a proceeding where the legal rights, duties or privileges of a party must by statute be determined by an agency after an opportunity for a hearing or in which a hearing is in fact held." There was no evidence at trial that the cease and desist order was issued in a "contested case" since no hearing of any kind was held. Thus the defendants had no right of direct appeal to Superior Court pursuant to § 4-183(c).
Could the defendants have requested the agency to issue a declaratory ruling pursuant to § 4-176? If they had done so and a hearing was held an appeal could have been taken to Superior Court, see § 4-183(c) read in conjunction with § 4-166(3)(B). If a hearing is not held CT Page 361 the aggrieved party can seek relief through the provisions set out in § 4-175.
It is difficult to see why the defendants could not have sought a declaratory ruling here. They point to dire possibilities threatening due process rights under some future circumstances if "exhaustion doctrine" is applied here. For one thing the court does not believe it is appropriate to apply the "exhaustion doctrine" in this context. All that the requirements for application of statutory injunction doctrine under Crabtree and Johnson
should demand in this context is that the party resisting the injunction shall have been afforded a fair opportunity to contest the basis of the agency ruling. If that party had the opportunity and failed to take advantage of it then there is a sound basis to say the party should not be allowed to raise a variety of defenses to the injunction action and/or demand that the state agency show irreparable harm. The statutory scheme was drawn up I am sure without any reference to the law as it applies to statutory injunctions and the burdens or lack thereof on state agencies seeking them. I can imagine a case where it would be unfair to a particular litigant to hold that he or she can't resist a statutory injunction where the litigant has no notice of the agency action or order because it was not a final decision (§ 4-177(b)) or because the state agency after the issuance of an order goes immediately into court seeking an injunction (§ 14-311e). As the defendants note § 4-176 unlike § 4-183(c) does not provide for a specific grace period in which to file for a declaratory ruling.
But the answer to such possibilities which threaten due process rights and would forestall the application of the Crabtree doctrine in statutory injunction cases is for the court faced with an application for injunctive relief in such a case not to apply Crabtree or Johnson v. Murzyn
and require the state agency to show irreparable harm and allow the party opposing the injunction to present all defenses available.
None of the possible problems the defendants envisage exist here, however. There appears no reason why a declaratory ruling could not have been applied for or why there wasn't time to do so despite the threat to seek injunctive relief. To say that asking for a declaratory CT Page 362 ruling would have been futile, Greenwich v. Liquor ControlCommission, 491 Conn. 528, 542 (1983) misses the point. That the agency might have rejected the petition for a declaratory ruling outright is not clear and if it did that would be an argument for not applying Crabtree statutory injunction doctrine with its easier burden on the state agency when it came to court asking for injunctive relief but does not excuse an obligation to file the petition in the first instance.
In the court's view, however, the problem of futility does arise as to declaratory rulings in one sense. Even if the defendants had petitioned for such a ruling, the plaintiff state agency, at its whim and at any time during the process set forth in § 4-176, could have come to court and sought injunctive relief. Litigants on either side shouldn't be forced to engage in pirouettes before state agencies where the only purpose would seem to be to allow them at a later time in some injunction proceeding the right to argue against the applicability of rules concerning burdens on a state agency in seeking statutory as set forth in Crabtree, Johnson v. Murzyn, and Conservation Commission v. Price. Commission ofHospitals Health Care v. Stamford Hospital in its dicta at 208 Conn. 671-72 never dealt with the precise problem before the court and certainly did not hold that the commission's application for injunction had to be granted because the hospitals failure to ask for a declaratory ruling. In any event, the court is not persuaded that these just discussed considerations should lead it to put aside its previously arrived at conclusion that injunctive relief would not be appropriate here.
(b)
There has been reference to the plaintiff's position that representations in the Bubaris letter that road improvements required in the original certificate would be completed shortly if a partial opening of the development were allowed. The Taco Bell was able to operate after the partial opening which in effect amended the original certificate. The road improvements, however, have not been done.
It is not absolutely clear to the court at least how CT Page 363 the plaintiff seeks to rely on the fact that these representations were made and then were not complied with.
Some sort of a straight estoppel argument could be made to the effect that because of these representations the defendant Pacetti cannot now ask that the court require the plaintiff to show irreparable harm or at the outer reaches cannot now even oppose the request for injunctive relief. The court has already discussed these issues in the first section and believes these considerations would not automatically entitle the plaintiff to injunctive relief and in fact has concluded injunctive relief should not be granted.
But the plaintiff does argue in one of its briefs that the court should consider these representations and the failure to fulfill them when it balances the equities in deciding whether to issue an injunction. Under certain circumstances that would certainly seem fair.
The problem the court has in using these representations for any purpose — in the first section the court considered them only for purposes of discussion — is that there is nothing in the record to indicate the plaintiff STC relied on these representations in permitting the partial openings.
The engineer, Mr. Chapman, testified he relied on the representations when he recommended that the STC grant the amended certificate. But there is nothing in the record as the defendants point out to indicate that the STC even knew of Mr. Bubaris' representations when it acted. Chapman himself said the representations as to road improvements were one of the things he considered in making his recommendation. When the STC issued the amended certificate pursuant to the December 18, 1990 letter to Pacetti (Exhibit C), the Traffic Investigation Report attached to that letter indicated it was based on only two conditions which had nothing to do with completion of the road improvements referred to in the Bubaris letter and did not encompass all the conditions set forth in the original certificate.
A so-called "Report of Findings" which was part of the "Traffic Investigation Report" just referred to said in CT Page 364 reference to the recommendation of a partial opening through the amended certificate: "This intersection with the existing geometry and phasing, will continue to operate at an acceptable level-of-service with the additional traffic proposed (referring to the Taco Bell operation and a Department of Motor Vehicles Facility that apparently never opened). Since Chapman prepared these comments, the court wonders how much he in fact did rely on the Bubaris representations as to road improvements.
(c)
The defendants raised two issues that the court does not accept and did not rely on in deciding not to grant the injunction, but believes these issues should be discussed.
The defendants argue that the development does not generate large volumes of traffic and thus is not subject to the provisions of § 14-311 which authorizes the issuance of injunctive relief. Agency regulations say that a development providing two hundred or more parking spaces or a gross floor area of 100,000 square feet or more generates large volumes of traffic, Conn. Agencies Regs. § 14-312-1(a). These arguments were raised in special defenses.
The present square footage does not fall within the regulatory criteria so the defendants argue that the STC would not have jurisdiction over this development unless it could show the development provided over 200 parking spaces.
Evidence was then presented as to whether in fact 200 spaces were provided; the evidence raised questions which rivaled the complications of scholastic philosophy. A witness counted 200 spaces but a dempsey dumpster in fact occupied two of the spaces. It was never brought out how the dumpster was emptied — did a truck intrude into the spaces to empty it, how often, would this make either one or both of the spaces susceptible to the count? What does the word "provides" mean as to traffic spaces? The defendants offered evidence to show although there may be 201 or 199 lined spaces in fact many to Taco Bell and Shawmut — 97 in fact and these were the only ones cleared of snow in the winter. CT Page 365
Somehow I don't believe a court is in a good position to interpret regulations such as this and what on earth they mean and what considerations they were based upon — no hint of the latter was presented to the court by either side. Since I have decided not to issue the injunction in any event I will not address this problem.
(d)
The defendants also claim that equitable relief should be denied because the plaintiff has not come to court with clean hands. Polverari v. Polverari, 29 Conn. App. 181, 202
(1992), cf Precision Instrument Mfg. Co. v. AutomotiveMaintenance Machinery Co., 324 U.S. 806, 814 (1945).
The state department of transportation owns land across the street from the Pacetti development which it had offered to sell. On August 3, 1993 the State entered into an agreement to sell the property to KRC Acquisition Company. This development would generate large volumes of traffic and KRC could terminate the deal if compliance with any road or traffic improvement requirements made the transaction too expensive for it.
If the plaintiff is successful in this case the improvements Pacetti would have to perform might relieve KRC of work it might have to do to get a certificate. Therefore, the defendants claim the plaintiff does not come to court with clean hands.
The court cannot accept this argument. The defendants are really raising the possibility of a conflict of interest which might affect a present position taken by the plaintiff in this case and equating that "possibility" with proof of actual wilful misconduct. Proof of the latter is a prerequisite for application of the clean hands doctrine. Also, the conditions set forth in the original certificate and the cease and desist order in this case predated the sales agreement with KRC by over seven months and the property was put out to bid a little over a week before the cease and desist order was sent to Mr. Pacetti. A bid proposal as even sent to Pacetti. It is even unclear to the court after examination of the transcript how much any road improvements done by Pacetti would inure to the benefit of operators of the development opposite his and CT Page 366 affect their obligation to make road improvements in order to get a certificate. Under all of the circumstances this is not an appropriate case for the application of the clean hands doctrine to deny equitable relief.
Conclusion
For the reasons previously discussed, however, the court does not believe the injunctive relief requested by the plaintiff against these defendants should be granted.