[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
POST TRIAL MEMORANDUM OF DECISION
This is an action brought by the Department of Environmental Protection (DEP) against Durable Wire, Incorporated. Durable Wire is a corporation registered in our state. In this matter, the DEP alleges that Durable Wire violated several provisions of Connecticut's Hazardous Waste CT Page 10268 Management Regulations, RCSA Sec. 229-449(c)-1, et seq. At all times relevant to the allegations in the complaint the defendant was a generator of hazardous waste as defined in those regulations and in § 22a-448 of the General Statutes. The DEP seeks penalties and an injunction ordering Durable Wire to comply with the regulations pursuant to §§ 22a-6 and §§ 22a-131 and 22a-438 of the General Statutes.
The underlying facts upon which the DEP bases its allegations that the regulations have been violated are not in dispute between the parties. Given the agreed upon facts, there is a dispute as to whether they constitute a violation of certain regulations. However, it is fair to say that Durable Wire does concede that it violated other regulations. There is great disagreement between the parties concerning the amount of any penalty and the method by which the penalty should be ascertained. Also, Durable Wire strongly objects to the granting of an injunction, compliance with which will impose substantial costs on this company.
 I.
As noted, Durable Wire concedes that it violated some of the regulations. In light of this, it makes sense at least to the court to first discuss the amount of the penalties the defendant is exposed to by proof of any of the violations. The court will then discuss what it believes are the rules and procedures by which the amount of penalty is to be ascertained.
Then the court will actually discuss the regulations it believes were violated and try to arrive at a fair penalty based on the previously mentioned rules and procedures and their application to the violations found in this case.
As indicated, this action is brought pursuant to RCSA § 22a-449(c)-1 et seq. These Hazardous Waste Management Regulations are created pursuant to the Water Pollution Control Chapter of the General Statutes, Chapter 446k. Section 22a-438 of the General Statutes provides that anyone violating any provision of the chapter shall be assessed a civil penalty, not to exceed twenty-five thousand dollars ($25,000) to be fixed by the court for each offense. The statute says that: "Each violation shall be a separate and distinct offense and in case of continuing violation, each CT Page 10269 day's continuance thereof shall be deemed to be a separate and distinct offense."
Durable Wire does not appear to contest that the federal Water Pollution Control Act upon which our water pollution control laws are based, Pac v. Upjohn Co., 21 Conn. App. 91,94-95 (1990), are strict liability statutes, see for exampleState of New York v. Shore Realty Corp., 759 F.2d 1032, 1042
(CA2, 1985), Mumford Cove A'ssn. v. Town of Groton,640 F. Sup. 392, 395 (D.Conn. 1986), Conn. Fund for Environment,Inc. v. Upjohn Co., 660 F. Sup. 1397, 1409 (D.Conn. 1987). That means that the DEP need only prove a violation of the regulations to make Durable Wire liable under § 22a-438 of the General Statutes.
Also, Durable Wire does not appear to contest the position taken by the plaintiff that no statute or regulation to which it might be liable requires actual environmental harm as an element necessary to establish liability. Durable Wire does maintain that the amount of any penalty which could be up to $25,000 per day per violation should be substantially affected by the actual environmental harm done. These are two separate considerations, however, and the court does intend to discuss Durable Wire's position on this point and the plaintiff's response to it.
How then should a court go about determining the amount of a penalty? What method, rules or procedures should be resorted to in determining the penalty?
In their briefs both parties refer to two penalty sections, § 22a-131 and § 22a-438. The former section is located in Chapter 445 which is entitled "Hazardous Waste." It reads in relevant part as follows:
 "Sec. 22a-131. Civil Penalty for violation of hazardous waste program. Any person who violates any provision of the state's hazardous waste program shall be assessed civil penalty of not more than twenty five thousand dollars for each day such violation continues . . . ."
This statute certainly gives no guidance to a court in setting penalties which may be enormous but then again neither do our criminal statutes. CT Page 10270
The plaintiff argues that the penalty provisions of Sec.22a-438 apply which is located in the "Water Pollution Control" Chapter, Chapter 446k. That statutory section reads in relevant part:
 "Sec. 22a-438. Forfeiture for Violations. Penalties. (a) Any person who . . . violates any provision of this chapter, or section 22a-6
or 22a-7 shall be assessed a civil penalty not to exceed twenty five thousand dollars, to be fixed by the court, for each offense. Each violation shall be a separate and distinct offense, and in case of a continuing violation, each day's continuance thereof shall be deemed to be a separate and distinct offense . . . In determining the amount of any penalty assessed under this subsection, the court may consider the nature, circumstances, extent and gravity of the violation, the person('s) . . . prior history of violations, the economic benefit resulting to the person . . . from the violation and such other factors deemed appropriate to the court."
Section 22a-438 gives more guidance but can or should it be used in determining the penalty for violations of the statutory subsections of the Hazardous Waste chapter? This question becomes important in deciding whether the court should consider the prior history of violations by a defendant when imposing penalties pursuant to the Hazardous Management Act.
The plaintiff argues that Sec. 22a-438 is the applicable statute to determine penalties and at page 16, fn. 3 of its Post Trial Brief says that: "The Hazardous Waste Management Regulations were established pursuant to the Water Pollution Control Chapter, Chapter 446k (where § 22a-438 appears). Consequently a violation of the Hazardous Waste Management Regulations is a violation of Chapter 446k for the purposes of imposing a penalty under Section 22a-438." The plaintiff cites Pac v. Upjohn, supra to support is position but I do not believe it does. However, it is true that Section 22a-438
explicitly says that penalties under it are to be imposed for violations of Chapter 446k, the Water Pollution Control Act "or section 22a-6 or 22a-7." Both these last mentioned statutory subsections give the Commissioner of Environmental CT Page 10271 Protection power to formulate regulations for all the environmental protection chapters, chapters 445 and 446k included. So under this reasoning violation of any regulations to enforce the various environmental acts can be brought under § 22a-438. The criteria set forth in the latter statute are the traditional considerations taken into account by courts imposing civil and criminal penalties and involve commonly accepted notions of retribution deterrence and fairness to people or companies injured or prejudiced by the wrongdoer's actions.
This reasoning is supported by the reasoning of Carothersv. Cappoziello, 215 Conn. 82, 103 (1990) which was reviewing a penalty imposed under Section 22a-226 located in the Solid Waste Management Act, Chapter 446d. That statute reads in relevant part:
"Sec. 22a-226. Civil Penalty.
 (a) Any person who violates any provision of this chapter or any regulation, permit or order adopted or issued under this chapter or any owner of land who knowingly permits such violations to occur on his (sic) land, shall be assessed a civil penalty not to exceed twenty five thousand dollars, to be fixed by the court for each offense. Each violation shall be a separate and distinct offense, and, in the case of a continuing violation, each day's continuance thereof shall be deemed a separate and distinct offense.
This statute is similar to Sec. 22a-131 in terms of the limited guidance it gives to the trial court in assessing penalties. Certainly past history of violations is not referred to as a factor in the statutory language. But this did not prevent the Cappoziello court from giving a broad reading to Sec. 22a-131 and saying the following at page 103.
 This court has not had prior occasion to rule upon the financial implications of civil penalties and injunctive relief imposed under our solid waste management statutes. In the absence of further guidance from the legislature, we find persuasive, although not binding, the authorities cited to us by both the defendants and the commissioner. We CT Page 10272 conclude that when trial courts are asked to impose penalties pursuant to § 22a-226 they are to be guided in the exercise of their discretion by considering such factors as those set forth in 33 U.S.C. § 1321(b)(6)(A), as well as by the two general goals set forth in the civil Penalty Policy; Env. Rptr. (BNA) p. 41:2991-93; of the federal Environmental Protection Agency. See Chesapeake Bay Foundation v. Gwaltney of Smithfield, 611 F. Sup. 1542, 1556-57 (E.D.Va. 1985), aff'd, 791 F.2d 304
(4th Cir. 1986) vacated on other grounds, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). These factors include, but are not limited to: (1) the size of the business involved; (2) the effect of the penalty or injunctive relief on its ability to continue operation; (3) the gravity of the violation; (4) the good faith efforts made b [by] the business to comply with applicable statutory requirements; (5) any economic benefit gained by the violations; (6) deterrence of future violations; and (7) the fair and equitable treatment of the regulated community. See 33 U.S.C. § 1319(d) (Cum. Sup. 1989);
Footnote 23 at page 104 says:
 Title 33 of the United States code (Cum. Sup. 1989), § 1319(d) provides in part: "In determining the amount of a civil penalty [for specified violations of the federal Clean Water Act] the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to company with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require."
All and more factors are cited by the court than are contained in Sec. 22a-438. The Cappoziello court also refers to the Gwaltney case which reviews penalty procedure under the federal Clean Water Act and in turn relies on EPA Penalty Policy 41:2992-93. That policy says a fine should be determined by considering the deterrence effect but then the penalty may be adjusted by taking into account various factors including "the degree of willfulness or negligence involved, the degree of cooperation involved, the violator's history of non-compliance and whether the penalty would force the CT Page 10273 violator out of business. See EPA Penalty Policy at 41:3000-02," 611 F. Supp. at page 1557.
What we have then is a Connecticut court (Cappoziello)
interpreting the penalty provision of a state solid waste management act by turning to the reasoning of a federal district court (Gwaltney) trying to ascertain the appropriate penalty for a violation of the federal Clean Water Act.Gwaltney in turn relied on federal civil penalty policy of the EPA applicable apparently to all types of violations of the federal environmental law.
All of this goes to establish the method of determining penalties should be the same for all violations of our state environmental laws no matter what chapter they may be in and no matter what type of environmental or pollution damage they are concerned with: solid waste, hazardous waste, water pollution, etc. Ultimately it makes no sense that a court should use a different standard or take into account different general penalty policies for a solid waste as opposed to a hazardous waste management or water pollution control problem.
It also makes little sense for state courts to fashion a penalty policy different in scope and nature from the federal policy. This might create confusion in regulated industries especially those with multi state business sites and serves no identifiable state purpose. In fact, it would deprive the state judiciary of a ready source of guidance provided by federal environmental policy regulations and federal decisions interpreting that policy.
Therefore, although state courts should not be rigidly bound by federal law as Cappoziello indicates, I will rely on the reasoning of Gwaltney which Cappoziello cited with approval, that case's reference to EPA Penalty Policy and theCappoziello court's reference to Title 33 U.S.C. § 1319(d) (Cum.Sup. 1989). Gwaltney accommodates all the factors referred to in Cappoziello, 215 Conn. page 103 and gives a framework within which these factors should be taken into account.
What does the Gwaltney court suggest as the appropriate procedure to determine the appropriate penalty? In fact the court lays out the test in a very succinct way. The court at 611 F. Supp. page 1557 refers to the EPA Penalty Policy and CT Page 10274 then says:
 The policy aims at two general goals: (i) deterrence; and (ii) "fair and equitable treatment of the regulated community." See EPA Penalty Policy, 41:2992-93. As for deterrence, the policy recognizes that both deterrence of future violations by the violator (specific deterrence) and by other regulated firms (general deterrence) is important. See id. at 41:2992. For deterrence purposes, the policy recommends a penalty that includes two components. First, it should include the "economic benefit of non-compliance"; otherwise, the violator and potential violators would perceive that it pays to violate the law, creating an obvious disincentive for compliance. See id. Second, the penalty should include an additional amount, which the policy characterizes as a "gravity component." If the penalty were limited to the economic benefit of non-compliance, regulated firms would find that they would have nothing to lose by non-compliance because a penalty for their violations would make them no worse off than if they had complied in a timely way. See id. The policy suggests that the gravity component reflect both the seriousness of the violation and — where extensive non-compliance with a regulatory program exists in an area — an additional amount to promote general deterrence purposes. See id.
 Once an appropriate penalty for deterrence purposes has been estimated the policy recommends that this "preliminary deterrence amount" be adjusted to ensure that the "regulated community" is fairly treated. See EPA Penalty Policy at 41:2992. The policy identifies a variety of factors that ought to be accounted for in arriving at a final civil penalty. Such factors include the degree of willfulness or negligence involved, the degree of cooperation involved, the violator's history of non-compliance, and whether the penalty would force the violator out of business. See EPA Penalty Policy at 41:3000-02.
When a court "adjusts" what it considers the appropriate penalty for deterrence purposes to ensure that the regulated community is fairly treated, it uses the word "adjust" to mean the court can increase or decrease the initially arrived at CT Page 10275 deterrence penalty after considering the various factors mentioned, see 611 F. Supp. at pages 1561 through 1565.
Of course the EPA penalty guideline set forth in Gwaltney
as that court noted are only a guideline. In fact in Gwaltney
the court applied the EPA guidelines with the agreement of the parties. As the Gwaltney court itself noted and asCappoziello affirmed, the amount of the penalty is committed to the "informed discretion of the court." U.S. v. T SBrass Bronze Works, 681 F. Sup. 314, 322 (D.S.C., 1988). But the federal courts to which Cappoziello referred to with approval all seem to agree that the "major purpose" of a civil penalty is deterrence, U.S. v. T S Brass Bronze Works,
supra, USEPA v. Environmental Waste Control, Inc., 701 F. Sup. 1172,1242 (ND Ind. 1989) and the guidelines used in Gwaltney
seem well-suited to keep the deterrence goal in mind as the primary consideration while making allowance for other factors that should be taken into account, see Keeney v. L SConstruction, 226 Conn. 205, 218 (1993) which refers to T SBrass Bronze Works in adopting the view that the "primary purpose" of civil penalties is deterrence.
2.
The court will now discuss the various types of violations alleged and whether these violations have been established by admission or proof. Then as to each category or type of violation, the court will try to arrive at an appropriate penalty considering the procedures and considerations set forth in Gwaltney and Cappoziello. The plaintiff believes a total fine of $150,000 would be appropriate; the defendant suggests that to the extent a fine must be imposed at all the court should impose a de minimis penalty.
(a)
Storage of hazardous Waste for Greater than Ninety Days
Durable Wire does not dispute that it accumulated four 55 gallon drums of waste perchloroethylene for greater than ninety days. Three drums were stored illegally for 191 days, one drum was stored illegally for 258 days. Under RCSA § 22a-449(c)-6(a) a generator who stores waste on a site for 90 days or more is required to obtain a permit. I think a sensible CT Page 10276 interpretation of the regulation is that there should be exposure to a maximum penalty of $25,000 a day for storage beyond 90 days where no permit has been obtained but that there should not be a separate penalty for each drum of waste of up to $25,000 a day for each day beyond 90 days. A court could certainly take into account the number of drums illegally stored in deciding how large a fine within the $25,000 a day maximum should be imposed. The gravamen of the offense here is failure to obtain the permit and since these are regulations and statutes imposing quasi criminal consequences on a defendant they should be strictly interpreted. Even with that, however, since items were stored 258 days without a permit, at $25,000 a day the maximum fine would be $6,450,000.
As Gwaltney says if deterrence is the main aim of civil penalties then the gravity of the offense must be taken into account. This should include the seriousness of the offense and where there is extensive non-compliance an additional amount should be imposed to promote general deterrence.
Application of these considerations promotes deterrence of this and other companies in highly regulated industries because like ordinary wrongdoers, they know if they really cause harm to people or the environment or create a high risk of doing so they might have to pay a heavy fine. Also, even though no actual harm is caused where there is extensive non-compliance with regulations the risk of causing harm would be greater and thus must make the offense more serious since a penalty would discourage this and other companies from engaging in widespread ongoing regulatory violations that carry the risk of harm the longer they are engaged in by violators.
In other words, not so much Gwaltney but common sense dictates that if we are concerned with deterrence actual and
potential harm are important factors in determining the gravity of a violation and thus the appropriate penalty to impose in light of that gravity to foster deterrence.
In other words, the fact that actual harm did not occur does not mean that the violation of a regulation was not grave, it just means that if there had been actual harm a much higher penalty would have been warranted. Nothing in U.S. v.Bethlehem Steel Corp., 829 F. Sup. 1047, 1055 (ND Ind., 1993) CT Page 10277 contradicts this view and U.S. v. San Diego, 21 Envtl. L.Rep. 21233, cited by the defendant, does itself seem to break down the gravity analysis into actual and potential harm components, id. 21234.
No actual harm was caused to the environment nor was any person injured as a result of the illegal storage of these the drums.
The testimony of Dr. Rao was offered by the plaintiff to show the potential danger that perchloroethylene presents. Dr. Rao qualified as an expert; he is a toxicologist who is employed by the Department of Public Health, he has extensive practical experience with the danger presented by various chemicals and substances to people, has published in this field and has substantial academic credits.
Perchloroethylene can have serious health effects; a person can become dizzy and loose consciousness as a result of exposure to it. Chronic exposure causes damage to the liver and kidney and animal tests indicate it is a probable carcinogen. So-called material safety data sheets attached to the defendant's contingency plan which will be discussed latter indicate this chemical is a central nervous system depressant. This material confirms Dr. Rao's testimony and indicates in confined areas inhalation can cause death due to ventricular fibrillation of the heart. It is a fairly volatile substance that vaporizes and can be transferred to the air. Inhalation is the key form of harmful exposure of this chemical. Basically, the potential for harmful health effects depend on the length of the exposure and how much exposure there has been. Also, once in the ground water this chemical can produce the same effect on health.
As far as the danger presented by release of this chemical into the air is concerned, this depends on the temperature — higher temperature increases its volatility. If there is a spill in terms of long run danger presented by leakage the volume of ambient air and ventilation are important factors in determining the dangers this chemical presents. No studies regarding these factors were presented to the court.
If there is a spill the danger presented would be reduced if it occurs in a bermed area on an impervious surface. The CT Page 10278 health effects of the spill could be reduced if persons in the vicinity have access to gloves, special suits and self-contained breathing apparatus. Industrial absorbents and open head recovery drums would reduce the possibility of exposure.
Protective gear would be most useful if worn at the time of any spill. Odor would warn a trained person that a spill had occurred and the odor would be apparent before there were sufficient concentrations of the chemical to make it hazardous to health. An established evacuation plan would reduce the risk of exposure. This chemical was stored in steel drums and it does not corrode or eat through steel.
Mr. Couch, a company official, testified that the company did have an evacuation plan in the event of a spill and did train its employees regarding the dangers this chemical presented. The contingency plan contained provisions for handling emergencies and indicated the location of various types of protective gear mentioned by Dr. Rao. Employees were trained in the use of this equipment and informed of the evacuation plan. The fire department was escorted through the plant and firefighters were shown the location of chemical storage areas.
Factors present here indicating a potential for harm are the very fact that drums were kept on these premises some 168 days beyond the permissible 90 day limit. Obviously the more time on the premises the greater possibility for industrial accidents or leakage. It must be said, however, that the nature of the industrial operations of the defendant were not explored so that the court cannot fairly determine whether the drums could have been damaged and caused to leak as a result of an industrial accident.
The potential for harm was also increased by another factor which constitutes a separate allegation against the defendant but which the court will now consider in determining the penalty for the improper storage of these drums beyond the permissible 90 day period. I find that the defendant's inspection of this storage area was inadequate. Mr. Couch's office was some 100 feet from the storage area and he regularly passed it on the way to the manufacturing area. Merely walking by and looking at the area won't satisfy the requirement of inspecting the barrels for leaks or damage. Adequate records were not even kept of these purported CT Page 10279 inspections. It is true that no actual leaks or ruptures were noted in these drums but that was the result of fortuitous circumstances, not as the result of any inspection procedure engaged in by the company.
Turning to the issue of economic benefit it is difficult to see how the storage of these drums beyond the 90 day period resulted in any substantial economic benefit to the defendant. But the plaintiff also claims the defendant in effect reaped economic benefit from its laying off Mr. Frank Garritta whose responsibilities included overseeing compliance with environmental regulations and health and safety requirements. Mr. Garritta earned between $20,000 and $30,000. Mr. Garritta was laid off in October of 1989. He had health and safety responsibilities in addition to those having to do with environmental regulations. The fact that after Mr. Garritta left his responsibilities were divided up between other employees does not belie the fact that the company saved money by not having to pay him and that the company was responsible for not complying with environmental regulations after his departure. With the violations of environmental regulations established here not only as to storage but other violations which the court will discuss, it ill behooves the defendant to argue that it should not be assessed as a penalty that portion of Garritta's salary that were devoted to ensuring compliance with environmental regulations. I cannot perceive a more effective deterrent on this and other companies to prevent them from dismissing people whose job it was to comply with the regulations and whose presence might ensure such compliance. The last environmental regulation allegedly not complied with went on to August 1992 when the outside storage tank was finally inspected. I do not believe it would be fair to extend the period within which the company can be said to have saved money from not employing Garritta can be extended to the point when closure as a storage facility or as a generator became an issue. This is a matter involving legal interpretation of the statute and regulations which cannot fairly be laid to the presence or absence of Mr. Garritta.
Also, I will factor in the benefit that accrued to the company as a result of Garritta's lay-off only in this one instance and not duplicate it in assessing the penalty for any other violations I may find.
As to the deterrence aspect of the penalty, I will assess CT Page 10280 a fine of $5,000 for the storage of the drums beyond the 90 day period on the basis of gravity of the offense. For economic benefit, I assess a penalty of $25,000 for the savings on Garritta's salary — I have taken into account that not all of his job involved environmental regulation compliance and his work was split up between others. I do not impose any additional penalty for the storage of the drums based on economic benefit.
Furthermore, I believe the penalty should be adjusted upward based on several considerations. I believe the evidence makes clear that the violation here was completely intentional. The seriousness of this intentional activity is compounded by the fact that knowing by its own admission the danger some of the chemicals presented, I believe the company clearly violated its duty under the regulations to inspect the storage area.
I also find that the record is replete with indications that in the past it had been brought to the company's attention that drums had been stored beyond the permissible time period. So-called "past violation" evidence as discussed above can be considered by the courts in these cases. It is not true that the court in Kenney v. L S Construction,
supra, limited consideration of the factors in § 22a-438 to water pollution control act violations, it explicitly permitted those factors (including "past violations") to be considered in imposing a penalty for violation of the solid waste management act, see 226 Conn. at pp. 214-215.
Also, there is no support in Gwaltney for the notion that "prior history" evidence is limited to an inquiry into the facts surrounding the alleged violations before the court that was the only evidence presented to the curt. The fact that neither Capozziello [Cappoziello] nor L S Construction considered prior history of violations as a factor in the penalties imposed in those particular cases just means that particular evidence was not presented to the court. All three courts explicitly recognized that courts could take into account past history of violations. Criminal courts do so on a daily basis and the defendant's interpretation of Gwaltney would limit use of such evidence in a way not contemplated by that opinion or by courts that impose penalties in civil or criminal cases, see generally State v. Huey, 121, 126, 127 (1986). I take it the due process rights of defendants in civil proceedings where CT Page 10281 deterrence is an accepted basis of financial penalty are no greater than the due process rights of defendants in criminal cases. In fact if companies in highly regulated industries know that their past history of violations will be taken into account if they are subjected to penalties for violation of the environmental laws the deterrent effect will probably be greater than that on defendants subjected to fines in ordinary criminal cases where the courts take past violations into account. These companies are run by trained and skilled people who have the means and the wherewithal to inform themselves of how the courts treat infractions by competitors in their industry. Their activities are planned and subject to tight control by management. They do not resemble the random activity of often isolated individual wrongdoers engaging in activity that subjects them to fines who later find themselves enmeshed in the criminal court process.
I do agree that past violations cannot be regarded as separate vehicles for imposing fines which then can be all added up to include a fine for the violation presently before the court — that would present due process problems since although a defendant may have had notice of the past violation it may never have been charged or have had a chance to defend itself.
But at the very least, past violations do become relevant in a case like this because having been warned in the past of the particular violation and the regulatory agencies concern this company continued to intentionally violate the regulations. This coupled with the inadequate inspections of the storage site show a lackadaisical attitude toward the environmental law.
Also, it should be noted that it only came out at trial through Dr. Rao's testimony that the chemicals involved were non-corrosive. That is the reason no actual harm occurred and why the potential for such harm was greatly reduced. But there is nothing to indicate the defendant's officials or employees knew during the violation period that the chemicals were non-corrosive. Thus the defendant is hard put to rely on the low potential for harm aspect of this violation to counter an adjustment up of the fine because of the willfulness of its activity.
Because of the intentional violations and the history of CT Page 10282 past violations[1] and notice of them which had no effect on this company an adjustment upward is warranted if the court is to ensure the regulated community is to be fairly treated, seeGwaltney, 611 F. Supp. at page 1557. I do so in the amount of $5,000. The total fine for this violation is $35,000.
(b)
Failure to label drum
The defendant failed to mark the accumulation date and label a drum of 1, 1, 1 trichloroethane, which is a hazardous waste. This drum was located in the same storage area as the four drums of perchloroethylene. Dr. Rao testified that the dangers to health presented by trichloroethane are similar to that of the other chemical. Failure to label can present a danger to employees and transporters who come in contact with an unlabeled drum. In fact no environmental damage or injury to people occurred here. For the same reasons discussed in the previous section, I will impose a $1,250 fine for failure to label based on considerations of deterrence. Because of prior warnings of violations in the past with regard to labelling which makes the failure to label more egregious, I will adjust the penalty upward to $2,000.
In the deterrence penalty initially arrived at of $1,500 I did not include any award for economic benefit. I cannot see how there was any separate benefit for failure to label and I have already taken into account the effect of laying off of Mr. Garritta.
(c)
Storage of Drums Outside Berm Area
On June 27, 1990, Mr. Harder from the plaintiff agency inspected the defendant company and found four drums outside the bermed area. Again, this is clearly a violation of the regulations. But in fact no substances leaked out of the drums. Because of the factors previously discussed as to the nature of these chemicals, failing to keep them inside a bermed area does present a potential for harm. A spill would have been more difficult to control. This was a violation of § 22-449(c)-33(c)(3) of the regulations. CT Page 10283
Mr. Couch testified that he moved the drums to arrange them for transportation that was to occur the next day or so. I accept this testimony and I also find that Mr. Couch put the drums back in the bermed area after two hours. I found Couch to be a credible witness despite his associations with the company. I felt his testimony as to the nature of his inspection of the storage area could have easily been embellished; he testified on that subject in a manner not helpful to the defendant's position but truthfully so I find his testimony credible here.
I do not, however, accept the defendant's interpretation of the regulations that because the drums were temporarily removed from the bermed area they were not being "stored" and there was no violation of the requirement that such drums be stored in a bermed area. If a drum is being moved from a bermed area to the actual transportation vehicle that would not be a violation — how are companies to comply with 90 day limits on storage. But moving drums out of bermed areas to "prepare' for transportation a day or more before the transportation occurs should not be an exception since there is no apparent need for it, none was presented, as a means to facilitate transportation.
Also relaxation of these regulations for such a purpose could encourage abuse and present real danger given the nature of some of the substances subject to these regulations.
But as indicated, I accept Mr. Couch's testimony. Given the length of time for which the drums were off the bermed area and the fact that the activity was related to a stated purpose which although not justifying the action indicates it was done with an acceptable motive I believe a deminibus fine of $1,000 is warranted since I also find no economic benefit. I will not adjust the fine upward despite a past history of storage of drums in non-bermed areas since that past history does not persuade me that the actions taken by Mr. Couch here were reflective of an ongoing pattern of careless placement of drums on non-bermed surfaces without any acceptable motive.
(d)
Failure to Inspect Storage Area
As previously discussed, I do not find that Mr. Couch's CT Page 10284 cursory inspection of the storage area as he passed it on the way to the manufacturing section of the plant satisfies § 22a-449(c)-33(d) of the regulations which requires that at least weekly an owner or operator must inspect container storage areas looking for leaks and for deterioration caused by corrosion or other factors.
However, many of these violations are interrelated under the Gwaltney test. I took into account this violation when I arrived at the penalty for storage of the four drums beyond the 90 day period. I concluded that failure to inspect increased the potential for harm. I also concluded that failure to inspect was a proper element to consider in adjusting the fine upward since it underlined the intentional violation of the regulations and the lackadaisical attitude the company took toward the environmental laws. Therefore I feel it would be inappropriate to impose a separate fine for this particular violation of the regulations.
(e)
Contingency Plan
Companies subject to the Hazardous Waste Management Act are required to maintain a so-called Contingency Plan. This requirement and the mandated contents of the plan are set forth in Section 22a-449(c)-26 of the regulations. These plans basically set forth what actions are to be taken in emergency situations. The plan must list all emergency equipment, an evacuation route and under subsection (b)(4) the plan must list the names, addresses, and phone numbers of all persons qualified to act as an "emergency coordinator." The list must be kept up to date and where more than one person is listed one must be named as a primary coordinator with the others listed in the order they will assume responsibility as alternates. Subsection (e) seems to say that there must be at least one such emergency coordinator but not necessarily more than one. This person must be familiar with the contingency plan, location of waste handled, records and the layout of the site. He or she coordinates any emergency response, assesses the nature of the emergency, notifies appropriate authorities and basically tries to control the developing emergency situation.
Given the responsibilities and knowledge of the CT Page 10285 contingency plan that the coordinator has, it is important that police and fire authorities have access to an appropriate coordinator if there are more than one. If the coordinator is on site he or she can assist those authorities immediately. If the emergency occurs when the plant is closed, the authorities must be able to contact the coordinator not only to assist them in their efforts but also so that the coordinator can begin to perform all reporting and damage control tasks dictated by the regulations.
In light of these important responsibilities, the emergency coordinator is an important individual. Subsection (c) of the regulations provides that the contingency plan "must be reviewed and immediately amended if necessary whenever; . . (4) the list of emergency coordinators changes."
The reason for this is obvious — the people at the plant must know the identity of the coordinator and any alternate and outside authorities must know who to contact in case of emergency.
The company failed to amend the list of emergency coordinators; the list continued to carry the names of three people after they left the employment of the defendant. One person listed as the second shift coordinator was not deleted because the second shift had been eliminated and the plan was not amended to delete two "alternate" emergency coordinators.
Durable Wire, however, claims that the regulations were not violated and relies on three separate arguments.
It notes that the plan only has to be amended under § 22-449(c)-26(d)(4) "if necessary." Durable Wire argues the amendment was not necessary because although the second shift emergency coordinator was not deleted the second shift was eliminated and it did not make any difference that the two alternates were not deleted from the list because Durable Wire "was a small manufacturing facility where the employees did not have to rely on a list to know who to call in the event of an emergency," p. 24 of Durable Wire Brief.
I believe that although Durable Wire's position makes sense from one aspect of the purposes of the contingency plan, it completely ignores another reason for the plan and the requirement that it be amended. This facility was downsizing, CT Page 10286 the second shift had been eliminated, it was not open at all times and an emergency coordinator or an alternate would not be on the premises at all hours as part of his or her normal job duties. Fire and police authorities have to have ready access to the emergency coordinator or an alternator when an emergency occurs at the facility in non-work hours; that's why their home phone numbers are listed. The emergency coordinator can be of obvious assistance to them and he or she has duties to perform under the regulations as a result of and following any emergency.
If people are not removed from the list, when an emergency occurs during non-work hours local authorities can be lead on a wild goose chase trying to track down people actually functioning as coordinators or alternates especially if the people properly still on the list cannot be reached. The fact that only one coordinator need be listed does not reduce the confusion that might result where a company elects to list several coordinators and then does not delete people no longer serving in that capacity.
Durable Wire is correct in pointing out that no actual harm resulted from the failure to amend the plan but that does not detract from the fact that the regulated community must have impressed on it the importance of amending these contingency plans especially as to the identity of the emergency coordinators. It may not be a problem during working hours where a coordinator or alternate would be on site but it could be extremely important during non-working hours. These statutes deal with the regulation of industries, large and small, using very dangerous substances.
It is true here that because of the number of people left on the list — despite the failure to delete three people — that the likelihood of a real problem arising for the authorities during a non-working hour emergency might be slight. The court will take that into account but where as here an amendment was necessary at to actual emergency coordinators available it is not an area where sloppy procedures should be condoned and deterrence to this and other companies is a valid consideration. The court does not believe any economic benefit resulted from the failure to amend the contingency plan. The court believes a deterrence penalty of $7,500 is warranted. CT Page 10287
As far as adjustments are concerned, the court concludes that the violation here was negligent not intentional. Also, there were no previous past violations or warnings concerning the contingency plan. In fact, the contingency plan was in other aspects quite complete and the company should be given credit for listing more than just one emergency coordinator and thus training others to do this important job. The fine as to this violation should be adjusted down $2,500 to $5,000.
(f)
Assessment of Tank
Pursuant to § 22-449(c)(105) as amended 7/17/90, an owner or operator of a regulated facility is required to conduct an assessment of any underground hazardous waste storage tank to determine whether the tank system "was leaking or is unfit for use." At page 32 of its brief, Durable Wire says the requirement "was buried among numerous other requirements incorporated by reference to EPA regulations."
As soon as it was advised of the regulation and of its failure to comply with it, the defendant did have the tank tested. The date of this procedure was August 14, 1992 so that there was a delay in compliance of over two years.
When the tank was tested no leak was found and no leaking had occurred. The tank was made of reinforced fiberglass.
Addressing the appropriate deterrence penalty, it would appear that no economic benefit accrued to the defendant from not having the testing done apart from the actual cost of the testing and the company eventually incurred that cost by having a contractor to do the assessment and deliver the appropriate reports to the plaintiff agency.
As to the gravity of the violation, no actual harm resulted to the environment or any person as a result of failure to do the assessment of the tank.
Concerning the potential for harm, it would be hard to imagine a regulation with which it would be more important for the regulated community to realize it had a duty to comply. It would seem that a regulation like this is quite necessary to try to ensure that contamination of the groundwater does CT Page 10288 not occur. In order to have evaluated the necessary scope of any penalty, it would have been helpful to have known the full range of chemicals pumped into tanks of this kind and the danger they presented to the environment. Hazardous waste was pumped into the tank, however, and the court regards this violation as serious. The deterrence fine is $7,500.
The court will now review the various factors necessary to decide if an adjustment to the fine should be made. I do believe that the violation here was not intentional but that does not mitigate the seriousness of the failure to act. It is completely unacceptable for a company required by its business to comply with regulations designed to protect the public health to say by way of excuse that it was not aware of the regulation because it was "buried" amid other regulations. It is the responsibility of a company to inform itself of regulations that apply to it. The regulation itself is quite clear and explicit and the company had no difficulty in understanding how to comply with it once it was brought to its attention. This is not a case where the language of the regulation was confusing thereby excusing a failure to comply, cf. U.S. v. White, 766 F. Sup. 873, 880. This is simply a case where a company failed to keep itself informed of an important regulation for no justifiable reason that the court can ascertain. Applying the Gwaltney criteria, the court believes the fine should be adjusted upward by $2,500.
Also, a credit downward is not warranted merely because the company did the tank assessment once the violation was brought to its attention — it had to do that anyway, cf.Gwaltney at 611 F. Supp. page 1562. This is not a case where a company for example discovered the non-compliance on its own after much effort and expense or where once a violation was suspected cooperated with the agency to ascertain whether there was a violation. Such activity should be rewarded to encourage efficient regulation of these industries but that is not what occurred here.
The fine for this violation should be $10,000.
(g)
Failure to Inspect Hazardous Waste Storage Tank
The defendant maintained a 4,000 gallon fiberglass CT Page 10289 underground storage tank to store hazardous waste.
Section 22a-449(c)-32(c) of the regulations states
 "(c) Tanks must be operated to ensure at least sixty centimeters of freeboard, unless the tank is equipped with a containment structure, a drainage control system, or a diversion structure with a capacity that equals or exceeds the volume of the top sixty centimeters of the tank."
Section 22a-449(c)-1(c) defined "freeboard" as follows:
 "Freeboard means the vertical distance between the top of a tank or surface impoundment dike and the surface of the waste contained therein."
Section 22a-449-(c)-34(b)(3) of the regulations in relevant part says
 "(b) Inspection. The owner or operator of a tank must inspect where present:
 (3) the level of waste in the tank, at least once each operating day to ensure compliance with Section 22a-449(c)-32(c).
There is no dispute that the defendant did not inspect the level of the waste in this tank "at least once each operating day."
In its brief the defendant appears to argue that Section22a-449(c)-34(b)(3) was not applicable to its storage tank because its tank was a covered underground storage tank.
"Tank" is defined in Section 22a-449(c)-(1)(c) of the regulations as follows:
 "Tank" means a stationary device which contains or is designed to contain an accumulation of hazardous waste and is constructed primarily of non-earthen materials, including but not limited to wood, concrete, steel and plastic, that provide CT Page 10290 structural report.
In its brief the defendant after noting that Mr. Couch did not believe the daily inspection requirement did not apply to his company's underground tank goes on to say that he believed "the maintenance of freeboard was only applicable to uncovered tanks `to prevent overtopping by wave or wind action or by precipitation' 40 C.F.R. § 265.194(b)(3)," page 30 of defendant's brief.
The defendant appears to be confusing the requirements the regulations place on a "surface impoundment" as opposed to a "tank". A "surface impoundment" is also defined in Section 22-449(c)-1(c) and is a topographical depression, man made excavation or diked area where hazardous waste may be stored. Such a "surface impoundment" need not be covered. The only reference to a protective cover in the regulations as regards these surface impoundments is at Section 22a-449(c)-34(b) of the regulations. But that regulation only requires that the dike itself must be covered to prevent erosion and preserve the structural integrity of the dike itself. "Freeboard" is applicable to these surface impoundments. The definition of that word as noted is defined as "the verticle distance between the top of a . . . surface impoundment dike and the surface of the waste contained therein." Because a surface impoundment dike is open in the sense that it need not be covered Section 22a-449(c)-35(a) of the regulations require that:
 "A surface impoundment must maintain enough freeboard to prevent any overtopping of the dike by overfilling, wave action, or a storm. There must be at least sixty centimeters of freeboard."
How the concerns the regulations express for an uncovered surface impoundment have anything to do with whether a "tank" as defined by the regulations is above or below ground escapes the court.
There is nothing in the regulations that provide support for the notion that the regulations governing tanks and their inspection applies to only above surface and not below surface tanks. If the defendant's position is accepted apparently there would be no inspection requirements for underground CT Page 10291 tanks.
It would seem to me that there is as important a need to require daily inspections of underground as well as above ground tanks. Maybe the need is greater because leaks in above ground tanks and dike enclosed surface impoundments are readily observable to company employees. The danger of leakage of hazardous material into the groundwater is apparent and the requirement of daily inspection to ensure that this does not happen should come as no surprise to any regulated company official reading the regulations with an appreciation that they were promulgated with an eye to protecting our common environment and health. The court finds that the inspections of the underground tank did not meet the daily inspection requirements of the regulations. The Hazardous Waste Management Plan of the company only required inspection on a weekly basis and for a portion of 1990 even weekly inspections were not made.
The court will now consider the appropriate penalty keeping in mind the primary objective is deterrence.
No evidence of actual harm to the environment was shown here. But the potential harm by failure to conduct daily inspections is obvious and it should be made clear to the regulated industry how important such a requirement is.
On the other hand no evidence was introduced to show that given the chemicals stored in this tank the danger of leakage into the groundwater was substantially increased by failure to inspect every operating day as opposed to at least weekly which was the company's practice for most if not all of the time. I regard the failure to conduct daily inspections as more serious than failure to make a tank assessment so that I believe a deterrence fine of $25,000 is warranted. I have not added to the deterrence fine any amount for "economic benefit" since I have no evidence before me which I can use to calculate how much the company might have saved by not conducting daily inspections.
I do believe, however, that certain adjustments must be made. I believe as I have decided that the regulations require daily inspections of underground tanks when the plant is operating. But the definition of "tank" does leave something to be desired. It does not explicitly define tank CT Page 10292 to include above and underground tanks. Also, the end of the definition says it is a "stationary device that is constructed of non-earthen materials including but not limited to wood, concrete, steel and plastic that provide structural support." Why would an underground tank need "structural support." On the other hand if a tank is not made of earthen material, it would be made of materials like those mentioned so how can it be said they only provide "structural support" — that is what the tank is made of in the first place. I do not believe all of this rises to the level of confusion that the court in U.S.v. White, 766 F. Sup. 873, 880 (E.D.Wash, 1991) found but I believe some mitigation in the penalty may be warranted because of this factor.
Also, it is true that Ms. Sullivan an engineer in the DEP wrote to the company in August of 1986 that "the best way to check for a leaking underground tank is to measure the level every Friday night and Monday morning." The plaintiff makes the point that the defendant cannot complain about being misled by the Sullivan letter because she did not purport to be interpreting the regulations and the inspection log indicates that after the receipt of the letter the company did not consistently follow her advice as to Friday and Monday inspections in any event. Also, the log used by the company indicated the tank level had to be inspected at the end of each shift.
On the other hand, it is hard not to read the Sullivan letter as a "conflicting regulatory message," U.S. v. City ofSan Diego, 21 Envt. L.Rep. 21233, 21236 (S.D.Cal, 1991).
Mr. Couch did say the plant was open and operating while he was employed there from 1984 to January of 1991. It is hard under any scenario to justify the almost complete breakdown in inspections in 1990 up until July 1990 when Ms. Harder brought the failure to inspect to the company's attention. After that date daily inspections were conducted. I believe an adjustment downward of $10,000 is appropriate. The penalty for this violation is $15,000.
The total penalty imposed is $68,000 for all violations.
3.
Mitigating Factor: Economic Condition of Company
CT Page 10293
I will discuss at this point whether the fine arrived at should be adjusted downward because of the financial situation of this company.
Mr. Burke Adams was the President and Chief Executive Officer of the company since 1983. He testified that between 1983 and 1993 revenues plummeted from 12 to 6 million dollars. Profits ranged from $900,000 in 1984 to $1 million dollar losses in 1990 and 1991 and a $300,000 loss in 1993. There was a decreasing market for the company's products. Employees varied from 50 in 1983, to a peak of 85 in 1986-1988 to 50-55 in 1989 to zero today. Manufacturing operations ceased in July 1993, all the physical assets were then sold and the plant was physically closed in September 1993. Proceeds of the sale of the assets went to repaying creditors and debts. Mr. Adams first testified the company was now worth between $0 and $150,000. but then indicated its value might be much less. He did not prepare the report on which he relied to present his testimony and also said he did not know the present value of the accounts receivable. The person who prepared the financial reports was not called to testify and was apparently available to testify. The plaintiff asks the court to draw a negative inference form the failure to call Mr. Morris who prepared the financial reports, Secondino v. New Haven GasCo., 147 Conn. 672, 674 (1960). The viability of that case may not be long lived. Besides, Mr. Adams was the President and Chief Executive Officer and did not have to prepare every report to give some idea of the company's financial condition. He certainly could testify as to the number of employees working for the company, the gross revenues and profits and whether the plant was still in operation. He could also give an opinion on whether the accounts receivable were likely to be paid given his experience with the company. I cannot equate the testimony of Mr. Adams with that of the witness inKeeney v. L S Construction, 226 Conn. 205, 216, 217 (1993) who was merely defined as the "manager" of the defendant partnership.
It is also true, however, that in important respects I have found flagrant, intentional, and continuous violation of the environmental laws. Therefore, as said in Cappoziello at215 Conn. 82, 105 the factor of the defendant's ability to continue in business should not be given "overriding weight" in the face of flagrant and repeated violations of the CT Page 10294 environmental statute before that court.
My problem with considering the economic condition of this company as a factor to reduce the fine is based on the very statement of that consideration in Cappoziello. At 215 Conn. page 103 that court says the trial court in setting the penalty should consider "the effect of the penalty or injunctive relief on (the company's) ability to continue operation." Gwaltney accommodates this concern at 611 F. Supp. page 1557 by using the consideration of "whether the penalty would force the violator out of business" as a reason to adjust the deterrence fine downward in the appropriate case. Gwaltney considers this as one of the factors required to ensure the regulated community is fairly treated — the violator still being part of the regulated community. The reason for taking into account the effect of the penalty on the violator seems clear. If possible the aim of environmental policy is to protect the environment not drive people out of business except in the most flagrant cases. Business people should be allowed to stay in business in the hope that imposition of fines and heavy scrutiny through court injunctions and orders will help them clean up their operations in the future. Workers also should not lose their jobs under these circumstances.
There is no reason to take these factors into account where the company which has violated environmental regulations is no longer in business. Where the financial condition argument was raised in Coppoziello [Cappoziello], LRS Construction, andGwaltney the defendant companies making the argument were ongoing businesses claiming a hearing penalty would drive them into bankruptcy or otherwise put them out of business. Here the business is closed, no evidence has been presented to indicate that it is likely to resume since the business collapsed because its product was no longer in as great demand according to Mr. Adams.
Therefore, there is no reason to reduce this fine based on either common sense or the case law and the regulatory policy it seeks to enforce. If the money is there the defendant should pay the fine, if it is not then the penalty cannot be paid from company coffers. This is not a criminal case where due process dictates a person who cannot pay a fine should not go to jail or where a court should reduce a fine if payment would cause humanly unacceptable consequences in a CT Page 10295 defendant's day to day life. The amount of any fine might affect the ability of other creditors to any money remaining but that is not a consideration that has anything to do with fairness to the regulated community nor does it provide any reason in equity why the company itself should be exposed to a lesser fine.
4.
Economic Benefit: ComplianceWith Storage Facility Closure Requirements
I did not take into account in arriving at a penalty any claimed economic benefit that accrued to the company as a result of failure to comply with closure requirements. Since I intend to order injunctive relief, given the nature of that relief I do not feel it would be appropriate to adjust any penalty upward on this basis.
5.
Injunctive Relief
The plaintiff seeks injunctive relief against the defendant requesting the court order the defendant to comply with the regulations concerning closure and post-closure procedure as set forth in Section 22a-449(c)-29 of the regulations.
If a defendant stores hazardous waste for over 90 days it subjects itself to so-called TSDF requirements and the closure and post closure requirements of the regulations. Compliance with these regulations will subject the defendant to substantial costs and reporting requirements.
The basis for the plaintiff's claim that the defendant is subject to these regulations is the fact that four drums containing hazardous waste were stored on the facility for over 90 days. The court finds and it not disputed that several drums of such wastes were in fact stored on the facility for more than 90 days. Also the defendant has not in fact complied with the closure and post closure requirements of the regulations for so-called TSDF facilities.
Section 22a-6 of the general statutes authorizes the CT Page 10296 Commissioner to seek injunctive relief to enforce the environmental laws. There is no question here that the plaintiff enacted the regulations on closure and post closure procedure in accordance with and pursuant to its statutory mandate.
In Johnson v. Murzyn, 1 Conn. App. 176 the court said:
 It is true that the issuance of an injunction is the exercise of an extraordinary power which rests in the sound discretion of the trial court and that ordinarily the party seeking injunctive relief has the burden of alleging and proving irreparable harm and lack of an adequate legal remedy . . . . An injunction sought pursuant to a statute by the public official charged with the responsibility for enforcing the law, however, is an exceptional case which stands on a different footing, id. page 179.
Referring to the earlier case of Crabtree v. Van Hise,39 Conn. Sup. 334, 337-338 (1983 the court at page 180 said that when a statutory injunction is sought all that must be shown is violation of the statute or ordinance. Also seeConservation Commission v. Price, 193 Conn. 414, 429 (1984),Greenwich v. Kristoff, 2 Conn. App. 515, 521 (1984).
In the Price case the court said however:
 It is the court's duty to carry out the intention of the legislature as expressed in the statute it has enacted and to make the remedy it has provided an effective and efficient means of dealing with violations of the act and regulations properly promulgated under its authority . . . . We point out however that `the grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a (trial judge) . . . is not mechanically obligated to CT Page 10297 grant an injunction for every violation of the law, TVA v. Hill, 437 U.S. 153, 193
. . . Hech Co. v. Bowles, 321 U.S. 321, 329 . . . Weinberger v. Romero-Barcelo, 456 U.S. 305.'. 173 Conn. at page 430.
Also see Burns v. Barrett, 212 Conn. 176, 179 (1989), andAmoco Productions Co. v. Gambell, 480 U.S. 531 (1987). I dealt with the problem in State of Connecticut Department ofTransportation v. Pacetti et al, 13 Conn. L. Rptr. 420, 424, 426 (1995) where I denied injunctive relief and concluded after reading Burns and the Federal cases cited by our courts that what those courts seem to be saying is that where the only proven allegation before a court is the failure to comply with a regulatory procedure by a party subject to the regulatory scheme, there must be some showing of the actual occurrence of the activity which the statutory or regulatory scheme presupposes to be a danger, threat or some otherwise legislatively defined infringement on the public interest. Once that is done the public entity can get injunctive relief without going the extra step of showing irreparable harm. What else does the broad language mean cited in Burns.
 A judge retains a reasonable discretion to decide whether injunctive relief is appropriate even though it is authorized by statute, 212 Conn. at p. 194.
Should the court here exercise whatever discretion it has in these statutory injunction cases to deny the relief requested by the plaintiff?
There are a variety of factors that might be considered as a basis to exercise that discretion against granting an injunction.
No evidence was presented to indicate that any pollution or contamination of the site resulted from the violations or that in fact the steps taken by the company to close the facility left a site dangerous to the environment. Durable Wire has ceased operations at this facility. Durable Wire claims to have complied with the closure requirements placed on a "generator" of hazardous waste under the requirements of the federal regulations, 40 C.F.R. § 265.111. CT Page 10298
The company hired a contractor to close the site in accordance with what it thought were the applicable state and federal regulations. The contractor supervised the removal of all hazardous waste for disposal off site, washed the concrete pad used for such waste management and cleaned and removed a waste acid tank from the site.
The cost of these closure steps according to Mr. Adams was approximately $35,000.
The injunctive relief sought here would require Durable Wire to take steps beyond those required of a "generator" of hazardous waste. The company would have to submit a closure plan requiring it to hire a consultant and engage in what may prove to be a costly review and approval process with the agency.
Durable Wire also claims it acted in good faith on this subject and in fact was mislead by DEP. The evidence indicates that in various reports and memos Ms. Harder, an agency inspector, listed Durable Wire as a "generator". If a company is a generator the more rigorous closure requirements that are the subject of this injunction request are not applicable. A company storing hazardous waste more than 90 days becomes a "storage or disposal facility" (a TSDF) and a TSDF would have to comply with the closure requirements the plaintiff seeks to enforce. Harder's reports and debriefing memo were reviewed and endorsed by her superior. In July 1992 Mr. Chernauskas, another DEP inspector, went to the plant site. In his report he characterized Durable Wire as a "generator". Durable Wire argues that DEP knew since 1990 that four drums were permitted to stay on site for more than 90 days and did nothing to require Durable Wire to obtain a closure permit or otherwise comply with TSDF closure requirements. Durable Wire argues that the demand for injunctive relief is punitive and only became a factor when it was apparent the matter would have to be tried.[2]
This is an extremely difficult case for me on the question of the issuance of the injunction because it is true in my view that there are certain equities or factors that argue against it. I do believe statutory injunctions should not issue automatically; in Pacetti I refused to grant an injunction requested by a state agency. CT Page 10299
In Pacetti a developer was permitted to commence building if several roadway improvements were met to facilitate traffic safety at the proposed shopping mall. The mall was built but never fully occupied. The State Traffic Commission amended its order to allow a restaurant to open at the otherwise empty mall without requiring all the previous conditions to be met. But then the state agency ordered all the original improvements be made although the only other business at the mall in addition to the restaurant had since closed down. At the hearing on the injunction no evidence was presented to show any danger to traffic safety. If I issued the injunction completion of the road improvements would have closed the restaurant and two dozen people would have lost their jobs. I could not do it.
Here I believe if I do not issue the injunction I am overturning the regulatory scheme. Unlike Pascetti evidence was offered here that the chemicals stored at this site present a danger to human health. In light of those dangers the commissioner has probably determined that a storage and disposal facility (TSDF) upon closure should have stricter requirements imposed on it than those imposed on "generator" facilities because TSDF stores these hazardous wastes on their property longer than 90 days — the very presence of the chemicals on the site for longer periods presents the possibility of greater danger to the environment.
There is a bright line test. If you store these materials greater than 90 days you are a TSDF and must comply with stricter closure and post closure requirements. Can I as a trial court conclude that is an improper or irrational policy and not enforce it in this particular case? On what grounds would I do that — due process? No record has been established to allow me to do that. If I denied this injunction on a claim no actual harm was done how could I grant a similar injunction against a company that as its business stores materials greater than 90 days if the company established or the record was clear that no actual harm was caused to people or the environment. In Weinberger v. Romero-Barcelo,456 U.S. 305, 313-314 (1982) which I relied on inPacetti even though the court denied a statutory injunction to prevent the Navy from discharging ordinance into the ocean where no environmental harm was proven the court did say that fines and criminal penalties could be used to force the Navy to get the necessary permit to discharge ordinance into the CT Page 10300 waters of Puerto Rico. Even if financial penalties could be imposed on Durable Wire for failure to comply with TSDF closure requirements that would not give the commissioner the relief that the statutory and regulatory scheme entitle him to obtain. Here the remedy the plaintiff seeks is the remedy the regulations provide for as far as closure of TSDF facilities are concerned and that remedy is the accomplishment of appropriate closure and post closure procedures.
I will order the injunctive relief requested. I also order a penalty in the amount of $68,000.
Corradino, J.